### S. B. & B. W. FLEISHER, Inc., v. ABBOTT.

(Circuit Court of Appeals, Third Circuit. April 13, 1915. Rehearing Denied April 26, 1915.)

#### No. 1912.

1. CUSTOMS AND USAGES ⬦7—REASONABLENESS—WOOL TRADE.

The custom of the wool trade, whereby if honest differences that cannot be amicably adjusted arise over the grading, which is done by one furnished by the buyer, either party may call the transaction off, is reasonable.

[Ed. Note.—For other cases, see Customs and Usages, Cent. Dig. § 7; Dec. Dig. ⬦7.]

2. SALES ⬦129—SALE OF WOOL—GRADING—CUSTOM—REJECTION.

Under the custom in the wool trade, whereby if honest differences that cannot be amicably adjusted arise over the grading, which is done by one furnished by the buyer, either party may call the transaction off, plaintiff having a contract to sell defendants 150,000 pounds of wool, and having offered, in part fulfillment thereof, a lot of 30,000 pounds, could reject or accept the grading thereof as a whole only, and could not require defendants to accept the part thereof with the grading of which he was satisfied, and to take wool from other lots to fulfill the contract.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 295; Dec. Dig. ⬦129.]

In Error to the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

Action by J. H. Abbott against S. B. & B. W. Fleisher, Incorporated. Judgment for plaintiff (217 Fed. 828), and defendant brings error. Reversed, and new trial awarded.

Frank P. Prichard, James Wilson Bayard, and John G. Johnson, all of Philadelphia, Pa., for plaintiff in error.

Reynolds D. Brown and Malcolm Lloyd, Jr., both of Philadelphia, Pa., for defendant in error.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

McPHERSON, Circuit Judge. The defendant below, S. B. & B. W. Fleisher, Inc. (hereinafter called Fleisher), was a manufacturer of

yarns, doing business in Philadelphia. The plaintiff, J. H. Abbott, was a dealer in wool, living in the state of New York. He did not grow the wool himself, but was a middleman, buying fleeces from the farmers and selling them to the mills. His method of operation was to go from place to place contracting for the delivery of fleeces at designated points, and usually submitting the fleeces to inspection at these points by the buyer. The wool in controversy may be divided into two classes, a superior grade subdivided into three varieties known as one-fourth, three-eighths, and one-half blood, and an inferior grade, also subdivided into three varieties, known as common, fine, and rejections. Common wool is clipped from sheep having no merino blood; fine is the wool of a full-blood merino sheep; rejections is the name of wools having certain defects that need not be specified; while one-fourth, three-eighths, and one-half blood come from crosses between a full merino and a coarse wool sheep, these admixtures being preferred even to the fine or full blood.

Not very long before January 6, 1913, Abbott had an interview with Fleisher in Philadelphia, in which the purchase and sale of wool during the coming spring was discussed. No contract was made at that time, but the contingency of their coming to terms afterwards was contemplated, and, since fleeces must always be separated or graded according to their quality, the subject of grading was taken up and the parties agreed that if a sale should be made, the wool should be graded at the various places in New York where the fleeces might be found, and the grading should be done by one of Fleisher's agents. The obligation to grade fairly would have been implied even if it had not been mentioned, but this requirement seems to have been expressly agreed upon. On January 6 Abbott opened a correspondence, and two or three letters were exchanged, the result being that on January 13 Fleisher ordered—

"100,000 lbs. of strictly choice New York State wool at 22¢ for the ¼, ⅜, and ½ blood, and 17¢ for the common, fine, and rejections, net f. o. b. cars, point of shipment * * * delivery to be made on or before May 1."

Abbott accepted the order, and shortly afterwards obtained an extension of time to May 20. By January 24 he had contracted for about half the quantity, and so notified Fleisher. On February 6 he wrote again to say that other buyers were offering higher prices than he could afford, and asked to have the contract price increased. Several communications followed on this subject, both by letter and by telephone, and on March 19 the prices and quantities were so changed as to be 22 cents and 17 cents for 47,000 pounds and 24 cents and 18 cents for 78,000 pounds (afterwards increased to 93,000 pounds), the other terms of the agreement remaining unchanged. About the same time Abbott began to make arrangements for grading and shipping the wool. On March 17 he asked Fleisher to send 260 bags immediately to Pavilion, N. Y., and on March 21 gave directions about forwarding bags to five other places, saying that he hoped to begin taking in wool at Pavilion the first week in April, and that he would let Fleisher know when to have the grader there. On March 26 he wrote, saying:

"I will want your man to load wool—at Pavilion the morning of April 5th, 2 days, at Le Roy, 9th, at Kent, 12th, 2 days, at Holcomb, 15th, at Hemlock, 22d, at Moscow, 21th, at Castile, 26th, at Avon, 28th."

— requesting Fleisher to:

"Please let your man have 2 or 3 New York drafts to fill out in payment for the wool when loaded at Pavilion and Le Roy so that I may have funds to take in the wool at other points."

In accordance with these requests the bags were sent, and Davies the grader reached Pavilion in readiness to begin the work of grading on Saturday, April 5.

At Pavilion the disagreement took place that has brought this dispute into court, but before recounting what happened there it will be advisable to determine the exact situation and the rights of the parties. And first we may note that no controversy has ever existed about the meaning of the letters, or about quantities or prices; the whole dispute is about the grading of the wool and the agreement in reference thereto. It appears that official inspection or grading is not known in this trade. And we are not advised whether expert graders are available who may be hired by any one desiring their services; the only evidence before us is that under the custom of the trade the grader is furnished by the buyer. As the buyer usually selects one of his own employés for this purpose, it is obvious that opportunities for friction are likely to occur, and we may be sure that the situation has not escaped the attention of all parties in interest. Being in the buyer's employ, the grader is inevitably in a difficult position. Even if this relation did not exist, his position would still be difficult, for in any considerable quantity of wool several grades will almost certainly be found, perhaps as many as six, and it is hardly possible that two minds would agree about the quality of every fleece. With the most thorough effort to be perfectly fair in the exercise of his judgment, the grader is almost certain to find himself in frequent conflict with the seller. What the grader may regard as an inferior fleece the seller may regard as superior, and each may be wholly honest in his opinion. If then we add the fact that the mind of the grader can hardly be completely free from the influence of the buyer's interest, owing to the relation between them, we may see good reason to believe that the most earnest effort of the grader may not succeed in keeping his judgment from going somewhat astray. Moreover, the seller is sure to suspect him of partiality, either conscious or unconscious, and this attitude of the seller is likely to affect his own judgment unfavorably. As each party is thus urged by his interest toward a hostile state of mind, it is easy to see that occasions for conflict need not be sought; they are constantly at hand, and may readily lead to explosions and irreconcilable differences of opinion. Fraudulent grading also is possible, and may sometimes take place.

Now, how are these disputes to be settled? As already stated, there is no trade authority to settle them, and the only other resource is to provide a remedy by agreement or custom, which in effect is agreement, or a course of conduct often repeated. We may be certain that acute men of business have understood the situation thoroughly, and have

used their best efforts to meet it. Conceivably it could be met in several ways. Official graders might be provided whose judgment should be final; but this course has not been adopted, no doubt for excellent reasons. Or it could be met by having, say, three graders who should be chosen as arbitrators usually are; but this course also has its own objections, and at all events has not been adopted. Or the buyer's grader might be given authority to decide finally, a course to which we may be sure the seller would hardly agree. Or finally the trade might gradually settle down upon a course of proceeding that on the whole appears to present the most advantages and the fewest objections. The evidence indicates that the problem has been worked out in this way, and has been solved by the following custom: The buyer furnishes the grader, who may be and usually is his own employé; the grader must act honestly, and he must also do his best to be impartial; but if differences arise that defy amicable adjustment, since they cannot possibly be decided on the spot, either party is at liberty to call the transaction off.

[1] At the trial there was some dispute whether such a custom was reasonable, and as the question is raised upon this writ of error we may say briefly that we see no sufficient ground to condemn it. The parties are dealing with an executory contract, which cannot be carried out until the wool is graded and the prices are thereby ascertained; and therefore we think it not only commendable, but almost essential, that the parties (either expressly, or by the implied acceptance of a well-known custom) should agree in advance how to meet such controversies as are likely to arise while they are engaged in the effort to execute the contract fully. On the whole, this custom seems to be fair and reasonable. In some respects it may perhaps be objectionable, but the situation is perplexing, and we shall not try to propose a better solution. The problem is a business problem, and when business men find some better course than has yet been discovered the courts will be ready to sanction it; for the present we take the custom in the stage it has thus far reached. Only a word or two more need be said about it. Obviously it offers at least one temptation to the buyer, namely, a way to escape an imprudent bargain. If such a bargain has been made, the grader may be tempted to grade so unfairly as to drive the seller to cancel the contract, but we need hardly point out that this would be fraud, a breach of the contract to grade fairly, and that for such a breach the buyer would be liable in damages adequate to redress the wrong. As we understand the custom, it does not apply to fraudulent grading, but to fair grading, meaning a situation where an honest and irreconcilable difference of opinion has developed.

[2] Thus understanding the rights of the parties, we may now turn to the occurrences at Pavilion. At this point from 25,000 to 30,000 pounds were awaiting inspection, this being the first quantity offered by Abbott in partial fulfillment of his contract. The grader examined the fleeces singly, and divided them into one-fourth, three-eighths, and one-half blood, and also into the inferior grades. The superior wool was sacked, hauled to the station, and put into cars for shipment, but Abbott would not consent to deliver the inferior grades because he

believed the pile to contain many fleeces that ought to have been put among the more expensive wools. The statement of claim does not aver that the grading was fraudulent, and no such theory was put to the jury except in the way of merely incidental mention; the case was tried, and has been argued, on the assumption that while the parties differed decidedly about the correctness of the grading, the difference of opinion was honest. That fraud is not charged appears from the plaintiff's brief, in which it is stated that:

"The plaintiff has consistently * * * taken the position that all that occurred at Pavilion was simply a difference of opinion between the plaintiff and the grader Davies as to the propriety of the grading of a portion of the wool. If, as the verdict of the jury establishes, the plaintiff was right and Davies wrong in the matter of the grading, possibly the plaintiff might, had he chosen, have called the contract off or have demanded a regrading. He, however did neither, but simply said, in effect, to the defendant: 'As we do not agree about this lot, let us go on and complete our contract out of the numerous other lots that I have purchased at other places.'"

This quotation shows the plaintiff's theory of the case, and it is consistent with what he did at Pavilion. He was willing to ship the wool that had been graded as superior, but he declined to ship the rest. Whereupon Fleisher demanded that he should ship either the whole of the Pavilion wool as graded, or none of it; and upon this crucial point the contract broke down. Was the plaintiff right or wrong? If the whole 150,000 pounds had been at Pavilion, it is hardly open to controversy that he would have been wrong. In that event the custom would have justified him in refusing to accept the grading as a whole if he were dissatisfied with it, but he would not have had the right to accept it in part and refuse it in part. And we do not think the principle has been changed by the fact that only some of the wool was there. Whatever the quantity was, he was offering it as a whole in fulfillment of the contract; that is, he was offering a definite quantity of wool to be graded, and although the grading could not bind him if he disagreed with it, he could not accept the part he regarded as advantageous and reject the part he regarded as disadvantageous. We do not say that he might not have rejected the grader's work at Pavilion as a whole, taking the position:

"It is true we cannot agree about this particular lot, but I have enough wool elsewhere to fulfill my contract, and I offer you that. Let us try to agree about the other lots, although we cannot agree about this."

He did not take this course, however, but adopted the wrong position deliberately, and thus justified Fleisher in refusing to accept a method of grading that he had not agreed to, either expressly or by force of the custom.

We need not take up the assignments of error in detail. What we have said will indicate sufficiently the rules that should have been applied in the district court; they will serve as a guide in case there should be another trial.

The judgment is reversed, and a new trial is awarded.